# UNITED STATES DISTRICT
# EASTERN DISTRICT OF ARKANSAS

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS
OCT 06 2015
JAMES W. McCORMACK, CLERK
By:_____ DLP CLERK

OSCAR STILLEY 10579-062                              PLAINTIFF

2:15-Cv-163-BSm-BD

V.

DEFENDANTS

UNITED STATES; DEPARTMENT OF JUSTICE-
FEDERAL BUREAU OF PRISONS; ~~CHARLES E. SAMUELS,
JR, DIRECTOR; J.A.KELLER, SOUTH CENTRAL REGIONAL
DIRECTOR; C.V. RIVERA, WARDEN; BECKY CLAY,
WARDEN; CHESTER TORRY, TRUST FUND SUPER-
VISOR; C GLASGOW; B. HUNT; SHU LIEUTENANT O.
MOSBY, ALL IN THEIR OFFICIAL CAPACITY~~
(Strikeouts in my own hand – see page 26)  *Oscar Stilley*

# PLAINTIFF'S VERIFIED COMPLAINT

Comes now Plaintiff and for his verified
complaint states:

## JURISDICTION AND VENUE

1. Plaintiff is a Federal prisoner, in the custody of
the US Department of Justice - Federal Bureau of Prisons
(DOJ-FBOP, or simply "BOP")

This case assigned to District Judge ___Miller___
and to Magistrate Judge ___Deere___

P. 1

2. Plaintiff was confined at FCC Forrest City Low (Forrest City) from 6-11-10 through 8-27-15.

3. From 9-2-15 to present Plaintiff has been confined at FCI Oakdale-1 (Oakdale).

4. The acts and omissions complained of herein occurred primarily at Forrest City.

5. Venue is thus proper under the general venue statute and otherwise. See 28 USC 1391(b).

6. The Federal Tort Claims Act (FTCA) 28 USC 2671 et seq., authorizes suit as to the FTCA claims herein.

7. The Freedom of Information Act (FOIA) 5 USC 552 and especially subsection (a)(4)(B) authorizes suit as to the FOIA claims herein.

8. The FOIA, 5 USC 552(a)(4)(F) authorizes a court to make findings concerning arbitrariness or capriciousness of the withholding of documents.

9. Plaintiff specifically seeks such written findings along with the remedies authorized therein.

10. The Declaratory Judgments Chapter, 28 USC 2201 et seq., provides legally sufficient authority for the declaratory judgments sought herein.

11. Thus this US District Court has both venue and jurisdiction over all the claims raised herein.

# PARTIES

12. The United States is the proper defendant in any FTCA lawsuit.

13. The Plaintiff Oscar Stilley has been confined in Special Housing Unit (SHU, or jail for the prison) since 9-10-15.

14. Due to severe limitations on access to the SHU Law Library, Plaintiff has been forced to make his best guess concerning proper parties defendant, amongst other things.

15. The DOJ-FBOP, as custodian of Plaintiff as well as certain records sought, is believed to be a proper defendant as to FOIA and declaratory judgment claims.

16. Charles E. Samuels, Jr, is Director of the DOJ-FBOP.

17. J. A. Keller is Director, South Central Region, DOJ-FBOP.

18. C. V. Rivera is Warden of the DOJ-FBOP prison complex at Forrest City.

19. Becky Clay is Warden of the DOJ-FBOP prison complex at Oakdale, Louisiana.

20. Chester Torry is Trust Fund Supervisor at Forrest City-Low.

21. Plaintiff sent an FOI request to Mr Torry on 8-14-15, requesting Trulines documents. ~~and forth to~~

22. Mr Torry ignored this request.

23. C. Glasgow is "Alternate Disciplinary Hearing Officer" (DHO) at Forrest City.

24. C. Glasgow presided over a disciplinary matter against Plaintiff.

25. B. Hunt is Unit Manager at Marianna Housing unit in Forrest City.

26. Ms. Mosby is SHU Lieutenant at Forrest City.

27. Plaintiff made proper requests under the FOIA and Program Statements, (PS) which govern the operations of the DOJ-FBOP, for certain records.

28. Glasgow, Hunt, and Mosby failed to disclose said records, or to formally respond.

29. Further facts concerning the acts and omissions of the defendants are set forth hereinafter within the body of this complaint.

# PROCEDURAL AND ADMINISTRATIVE MATTERS

30. Plaintiff submitted a Tort Claim containing multiple issues, to the DOJ-FBOP.

31. Plaintiff received a "Right to Sue" letter indicating a deadline for filing suit of 10-15-15.

32. Plaintiff has asked for his legal papers, so as to file a proper complaint with all exhibits attached.

33. Lieutenant T. Steffey has informed Plaintiff that he cannot have access to his legal papers while on hunger-strike.

34. Other SHU personnel have informed Stilley that forfeiture of a legal claim is just part of being in SHU.

35. Plaintiff has been denied paper suited for court filing despite repeated polite request.

36. The paper upon which this complaint is written was secured through clandestine means, without the knowledge or consent of SHU staff.

37. In addition to the missing tort claim, Plaintiff is not in possession of the FOIA requests. They are all either "in property storage" or plaintiff never got a copy back from the pertinent records custodian.

38. Plaintiff assumes, indeed is virtually certain, that it will be necessary to amend this complaint after Oakdale authorities recognize the legal duty to allow inmates access to their legal papers.

39. Plaintiff reserves and claims the right to amend this complaint within a reasonable time of receipt, possession, and reasonable use of his legal papers.

40. Because amendment is a virtual certainty, Plaintiff has elected to file this complaint without any exhibits at all.

41. In the interests of readability Plaintiff is assigning exhibit numbers to the following documents; for identification;

1) Tort Claim
2) "Right to sue" letter
3) Forrest City Disciplinary Incident Report, aka "shot"
4) Forrest City DHO Report
5) Form 409 "Request for Transfer" used to transfer Plaintiff to Oakdale

P. 5

6) Custody Classification Form for Plaintiff

7) Oakdale "shot"

42. Plaintiff has exhausted certain administrative remedies and is in the process of exhausting others. Those matters will be addressed in other proceedings. Nothing herein should be construed as an action under 28 USC 2241 without fair notice and opportunity to be heard.

43. Plaintiff is sensitive to his duty to plead a "short, plain statement" showing entitlement to the relief sought, especially in a handwritten pleading.

44. Nevertheless, Plaintiff presumes that a written finding of arbitrary and capricious withholding of public records, under 5 USC 552 (a)(4)(F), ~~decatha~~ or that the circumstances "raise questions" of same, requires a substantial showing on the part of an aggrieved plaintiff.

45. A proceeding by Special Counsel under ~~the~~ (a)(4)(F) is likely to be in the interests of judicial economy, by and through "the corrective action that the Special Counsel recommends."

46. On information and belief, a Special Counsel will discover that some unlawful withholding of information is done solely or primarily at the instigation of superior officers.

47. Plaintiff incorporates all counts and parts of this complaint into all other counts, to the extent not unlawful, unethical, or inconsistent with the purposes of this complaint.

# FACTUAL BACKGROUND

48. While at Forrest City, Plaintiff voluntarily checked himself into SHU for a hunger strike, seeking various concessions, on 4 separate occasions.

49. Plaintiff was singularly unsuccessful at getting anything through "offensive" hunger striking.

50. Plaintiff was repeatedly counseled, by BOP staff and others, to use administrative remedies, court process, public awareness campaigns, etc., for the redress of grievances, rather than hunger strikes.

51. Plaintiff eventually saw the wisdom in this advice.

52. Associate Warden Smith at first told Plaintiff that he could not assist other inmates with legal work.

53. Upon discovering the truth, AW Smith approached Plaintiff, apologized and corrected himself. He frankly acknowledged Plaintiff's right to help other inmates with legal work.

54. Plaintiff openly assisted other inmates with a wide range of legal matters, but especially FTCA Tort Claims and lawsuits to follow.

55. Plaintiff drafted most of the letters, tort claims, and lawsuits on his Trulincs email account, as "draft emails."

56. Trulincs is a wretchedly inadequate substitute for a word processor.

57. Trulincs has tiny margins, small fonts, a 13,000 character limit, no bold, underline, or italics capability, and no "cut and paste" function.

58. Trulincs had virtually nothing to commend it save the fact that it was available, and allowed the editing of documents days or even months after the initial drafting.

59. Trulincs documents must be saved at least every 60 days. Otherwise the file is automatically deleted.

60. Plaintiff often spent $200 - $300 per month on Trulincs, mostly for the drafting or printing of legal documents.

61. Plaintiff virtually always left the Trulincs header on letters, tort claims, and complaints, which contains his name and BOP register number.

62. Plaintiff drafted about 40 tort claims that were submitted to the BOP and/or other Justice Department entities, mostly directed to Mr Samuels or Mr Keller.

63. Plaintiff drafted over 10 FTCA complaints actually filed in court.

64. Plaintiff drafted letters, motions, and other documents necessary or proper for the prosecution of such litigation.

65. Plaintiff maintained and regularly updated logs of tort claims and lawsuits, showing the status of the case, impending deadlines and due dates, etc.

66. Plaintiff was fully aware that all these documents were subject to monitoring, and presumed that his own account was well monitored.

67. Plaintiff routinely received PACER dockets and docket items for fellow inmates needing same, on Trulincs, for both criminal and civil matters.

68. Plaintiff openly discussed his litigating activities with BOP employees and inmates alike.

69. Plaintiff by his litigating and advocacy secured many necessary surgeries, dental procedures, and other professional services previously denied to the inmate.

70. In some but not all cases, the promise or delivery of professional services was sufficient to forestall any tort claim, or to avoid any lawsuit on a previously filed tort claim.

71. In February of 2015, Ms. Judith Lamarre, Assistant Health Services Administrator (AHSA) called Plaintiff to her office on a Saturday, and asked to be given advance notice of intent to file a tort claim, to give her a better opportunity at early resolution.

72. Plaintiff agreed and began using this process, with good effect.

73. Plaintiff was also widely known throughout the compound, to inmates and staff alike, as an apostle of good health through such inexpensive means as good diet, exercise, "juice fasting," kidney and liver cleanses, holistic dental health preservation methods, etc.

74. Plaintiff repeatedly and openly pleaded for opportunities to save the taxpayers far more money, through health improvement, than he cost the Treasury through tort claim judgments.

75. For example, Plaintiff sought a chance to avoid the cost of lithotripsy for kidney stones, or gallbladder surgery, by appropriate cleanses.

76. The efficacy of such cleanses would be completely verifiable by objective medical evidence.

77. Plaintiff didn't claim the infallibility of such remedies, but rather claimed that such methods, properly pursued, would be effective more often than not.

78. Plaintiff gained the respect of at least some of the medical staff, for his efforts to improve health while cutting medical costs.

79. The BOP has denied Plaintiff access to tangible items necessary for kidney and liver cleanses, "juice fasts," etc.

80. Plaintiff saw one footnote in a legal pleading signed by an Assistant US Attorney (AUSA) in Little Rock, Arkansas, that cast aspersions on Plaintiff's legal work.

81. Plaintiff was put in SHU under highly suspicious circumstances on 2-18-14.

82. Except as noted herein, Plaintiff worked openly, under claim of right, without any claim that his assistance of other inmates was illegal, until June 2015.

83. In June 2015, Plaintiff was called to the Lieutenant's Office concerning a settlement letter drafted on behalf.

P. 10

of Randy Werst, and a letter from John Castleberry containing a threat to hunger strike,

84. Lieutenant M. Lonero (female) at first claimed Plaintiff could not use his Trulincs account to draft legal documents, and claimed that Plaintiff might be punished if he was again caught drafting a letter threatening a hunger strike.

85. Lt. Lonero could not identify any rule in prohibition of either of these activities.

86. After conversations with Acting Captain Andino (male) Plaintiff concluded that the right to assist other inmates with legal work wasn't seriously challenged, but that the right to include a threat to hunger strike was.

87. Plaintiff drafted a "Request for Informal Resolution," Plaintiff's anticipated Exhibit "8," asking for formal assurances that helping another inmate with a threat to hunger strike would not be punished. This was dated 7-7-15.

88. Plaintiff's Unit Manager B. Hunt, and Counselor L. Boston signed a response the next day, 7-8-15.

89. The response said "... Inmates do have the right to indicate their intent to [unknown word inserted here] hunger strike. However, staff are aware it is often a bid for attention."

90. Mr Hunt and Ms. Boston both knew that Plaintiff would rely on this response as protection against disciplinary action for threats to hunger strike.

91. There was no rational basis for filing a BP9 to the Warden, since Plaintiff got everything he wanted as to that issue in informal resolution.

92. John Castleberry had dental problems that caused intermittent pain.

93. Castleberry asked Plaintiff how long it would likely take to get relief using the administrative or tort claim process.

94. Castleberry opined that the BOP could simply outwait him, pull his teeth, and leave him with inadequate dental function, based on the normal time frame of the tort claim process.

95. Plaintiff informed Castleberry that the administrative process would probably take longer than the tort claim, and would certainly be more difficult to win.

96. Castleberry objected to signing a consent form saying he freely and voluntarily consented to the extraction of salvageable teeth, when such consent was in reality extorted through the lawless denial of reasonable and timely dental care.

97. Castleberry was particularly incensed that Forrest City told the American Correctional Association (ACA) in 2011 words to the effect that routine dental work was generally accomplished within a week, although some complicated procedures take longer.

98. Three to six years is closer to the truth.

99. Additionally, ~~unprofessional~~ unprofessional temporary repairs are often used in place of permanent repairs.

100. Castleberry went on hunger strike.

101. Castleberry out of his hunger strike received assurances 0 of 1) dental care sufficient to maintain the full dental function of his mouth, even if that included ceramic bridges, and 2) delivery of that service in ⅓ to ⅕ the current average wait.

102. Plaintiff did a routine "resave" of a large number of documents on 7-5-15.

103. Lt. M. Lonero called Plaintiff to the Lieutenant's Office on 7-21-15 and accused him of drafting multiple threats to hunger strike on 7-5-15.

104. Stunned by the accusation, Plaintiff asked "what's your evidence of that?"

105. Lt. Lonero responded "I don't need evidence - you're going to SHU." Plaintiff was immediately hustled out the door.

106. Plaintiff frantically tried to explain that those documents were re-saves. He repeatedly pointed out that archival data would show 4-5 saves per minute, barely enough time for all the required mouse clicks. This was done as Plaintiff entered SHU.

107. Plaintiff also explained that he had official documentation affirming that a threat to hunger strike is not a punishable offense.

108. Plaintiff declared a hunger strike as soon as he was dressed out in SHU clothes.

109. Superior personnel immmediately told SHU personnel to put Plaintiff "on paper."

110. The term "on paper" means the inmate's clothes and bedding are all taken away, replaced by ~~coarse~~ gauze shorts, a thin paper smock, and 2 narrow, thin sheets. The inmate is denied virtually all other property to which he would ordinarily be entitled.

111. Plaintiff stayed "on paper" for 11 days.

112. Later on 7-21-15, Plaintiff was delivered ~~~~ a "Disciplinary Incident Report" (anticipated Exhibit "3") also known in prison parlance as a "shot."

113. The shot contained the same material falsehoods to the effect that Plaintiff did truly herculean amounts of work 7-5-15.

114. Plaintiff's Disciplinary Hearing Officer (DHO) paperwork was not finished ~~~~ in time for DHO hearing the 1st week.

115. Forrest City simply did not supply a DHO for the next 2 weeks in a row.

116. Thus "administrative detention" detainees were segregated for at least 2 extra weeks through no fault of their own.

117. The DHO, Mr. Glasgow, heard Plaintiff's case 8-12-15.

118. Mr Glasgow soon agreed that Plaintiff had not encouraged a group demonstration.

P. 14

119. In virtually the same breath, Alternate DHO Glasgow declared Plaintiff guilty of "Conduct Disruptive to the Security of the Institution."

120. As shown in Plaintiff's anticipated Exhibit "4," the Alternate DHO considered the statements of witnesses and the documentation printed off Plaintiff's Trulincs account.

121. Plaintiff was not however provided with copies of or access to either of these classes of documents.

122. Plaintiff submitted the "Informal Resolution" saying that inmates have the right to indicate their intent to hunger strike.

123. A third party picked B. Hunt as Plaintiff's staff representative.

124. B. Hunt refused to defend his own words, choosing instead to argue against Plaintiff.

125. Mr. Glasgow refused to even consider archival data to prove that the documents were prepared long ago, even though dates on the body of the documents were consistent with Plaintiff's story.

126. Rather, Mr. Glasgow cut Plaintiff off after announcing the "Conduct Disruptive" finding, asking "Do you want to hear the punishment, or not?"

127. The punishments imposed were:
   30 days disciplinary segregation with no credit for time served.
   Disallow 41 days Good Conduct Time
   Forfeiture 14 days non-vested good time

90 days loss of phone
180 days loss of commissary and Trulincs.

128. On 8-14-15 Plaintiff sent a cop-out to Chester Torry, Trust Fund Supervisor at Forrest City Low, asking for a full set of his Trulincs documents, with archival data and restoration capabilities, pursuant to the FOIA.

129. Plaintiff needed this not only for his own defense but also for the benefit of other inmates who relied upon him for assistance.

130. The loss of Trulincs access ensured that the documents could be preserved only with the help of Trust Fund, which administers the system.

131. Plaintiff asked for this information in digital format, supplying suitable email addresses to which a link might be sent. See 5USC552(a)(3)(B) & (C).

132. Mr. Torry ignored the cop-out. (formal request to staff)

133. Plaintiff has in the past sent multiple ~~copies~~ requests for information to Mr. Torry, which he routinely ignores. Then when inquiry is made in person, he won't talk, saying "send me a cop-out."

134. Mr. Torry charges as much as twice the price authorized by the Program Statements, for goods sold, on commissary.

135. Mr. Torry refuses to provide justification for prices or accounting of money held in trust for inmates, for the information of the Trust Fund beneficiaries.

P. 16

136. On 8-16-15 Plaintiff sent a cop-out to Lt. O Mosby asking for forms BPA0321, BPA0292, and BPA0295, plus all staff memos and investigatory memos for the current stay in SHU, as well as the stay in SHU from 2-18-14 through 3-20-14.

137. Forms BPA0321 are required in order to document the placement of an inmate "on paper," or under some other more restrictive confinement, than the standard conditions of administrative detention. Program Statement (PS) 541.22 (a)

138. More restrictive conditions must be reviewed and fully documented on a BPA0321 every 5 days. Id.

139. The BPA0295 is used by the Segregation Review Officer (SRO) to document 3 day, 7 day, and 30 day reviews of detention. The 3 day hearing is 1 time only. The inmate is entitled to a hearing on the first periodic 7 day review, and also on each periodic 30 day review. PS 541.26. The BPA0292 Special Housing Unit Record must be considered as part of that review.

140. The stay in SHU commencing 2-18-14 was the result of an "arrest" of Plaintiff for allegedly stealing milk and apples from chow hall.

141. In fact the food was all scavenged or given to Plaintiff by other inmates.

142. In fact Plaintiff is notorious for scavenging milk left on the tables rather than to take milk off the cold bar. Plaintiff does not like to waste taxpayer food.

143. Plaintiff was sent to the Lieutenant's bench with about ten other inmates.

144. All the "thieves" except Plaintiff, the resident lawyer, were sent home with no punishment and no accusation.

145. Plaintiff suffered the loss of 27 days good time, 30 days in SHU, plus loss of privileges.

146. Plaintiff refused to eat.

147. After 9 skipped meals Plaintiff was officially on hunger strike, and had to be moved to a single cell pursuant to official policy.

148. Plaintiff was put "on paper" for the remainder of the 30 days in SHU.

149. Plaintiff's property was taken, including his prescription Nystatin.

150. Plaintiff tried for several days to get the Nystatin back.

151. After duly warning staff, Plaintiff refused Boost unless and until the Nystatin was returned.

152. Plaintiff was taken to the emergency room where his blood sugar reading was 19.

153. The ER doctor stabilized Plaintiff with dextrose/saline solution, wrote a new prescription for Nystatin, opined that Plaintiff was in his rights to hunger strike, and sent Plaintiff back to SHU.

154. The BOP tried to "freeze Plaintiff out" with low temperatures and inadequate clothes.

155. Plaintiff once again forced the BOP to back down, once again experiencing the effectiveness of defensive hunger striking.

156. Considering the cost of the emergency room, 27 days extra incarceration, the reaction to 3 apples and 5 pints of milk, which otherwise would have hit the trash can, cost the taxpayers at least several thousand dollars.

157. Shortly after the 8-16-15 cop-out to SHU Lt. Mosby, Plaintiff was informed by a BOP employee that ~~the reported records did not exist~~ at least some of the requested records were missing.

158. On the morning of 8-20-15, Plaintiff was informed by the SHU Officer Mr. Halk, that if Plaintiff would eat his Disciplinary Segregation (DS) time would be cut, and he could leave SHU as soon as medical clearance was received.

159. Plaintiff ate and rejoiced.

160. Plaintiff was blissfully unaware that a form EMS-409.051 "Request for Transfer/Application for Management Variable" dated 8-18-15 had been signed by his Case Manager James Morman, By James E. Robinson for the Warden, and Unit Manager B. Hunt.

161. This document, anticipated Exhibit "5," relied on the "shot" as justification for the transfer.

162. B. Hunt said nothing about the fact that he had stated, in writing, that Plaintiff had the right to engage in the allegedly offensive conduct.

163. Plaintiff asked for but was denied the reasons or a copy of the form at Forrest City. Plaintiff fortuitously secured a copy after arrival at Oakdale.

164. "The form says that "...[Plaintiff] is no longer appropriate for this facility due to the negative influence he has over certain inmates at this facility.... A transfer to another facility may deter his negative behavior."

165. "Negative behavior" is merely codespeak for the willingness and ability to use the FTCA to effectively secure medical or dental care, and/or legal recourse for the denial of medical care.

166. Plaintiff arrived at Oakdale on 9-2-15.

167. Plaintiff was summoned to an "Admission and Orientation" session on or about 9-8-15.

168. Plaintiff was asked to sign forms saying that he had been provided a copy of the local rules concerning allowable property, which had not actually been provided.

169. Plaintiff was also asked to sign forms saying that he had viewed certain video resources, which were not actually shown.

170. Plaintiff refused to sign any such false statements.

171. Plaintiff went to Receiving and Discharge (R&D) on 9-10-15 to retrieve his personal property.

172. An officer named T. Ardoin saw a 3" ring binder, grabbed it, and began loudly and harshly berating Plaintiff for having it.

173. Plaintiff responded that it had survived numerous searches at his previous prison, and no one objected to it.

174. Mr. Ardoin continued to get more agitated, such that Plaintiff perceived it as an attempt to provoke,

175. Some time later Mr. Ardoin said "Lock him up in that holding cell - I'll write him up for insolence!"

176. After a few minutes in the holding cell, Lt. Trull called Stilley into an office, advanced to within about 9" of Plaintiff's face, angrily berated him, and demanded an apology to Mr. Ardoin.

177. Plaintiff apologized.

178. Mr. Ardoin said he accepted, forgave completely and would not write a "shot."

179. Plaintiff and Mr. Ardoin had a very pleasant 10-15 minute conversation with Mr. Ardoin.

180. Mr. Ardoin offered a green cart to take the property to the housing unit, which Plaintiff accepted.

181. Plaintiff brought the cart back on the 10:00 yard recall, and left a "thank you" note.

182. Plaintiff thought he had just acquired a friend for life.

183. On the way back to Plaintiff's cell, Plaintiff was instructed to go see Lieutenants Gotreaux and DeVille. They are both Special Investigative Services (SIS) Lieutenants.

184. Lt. DeVille informed Plaintiff that he had a reputation for hunger strikes and litigation.

185. Plaintiff responded that he had no plans for offensive hunger strikes.

186. Lt. DeVille informed Plaintiff that he had shipped to Oakdale to discourage his habit of helping other inmates with legal work.

187. Plaintiff responded that he had openly assisted other inmates with tort claim litigation, openly and under claim of right, and had no intent to do otherwise at Oakdale.

188. Lt. DeVille informed Plaintiff that he could transfer him to a Medium, or a US Penitentiary, at will, and Plaintiff would have no effective recourse whatsoever.



189. Plaintiff was offered a transfer to camp, by Case Manager Morman, shortly before the "shot" at Forrest City.

190. Plaintiff turned it down because he didn't want to abandon his legal work at Forrest City Low.

191. Plaintiff sees no way to put Plaintiff in a USP except through serial "shots" that drastically raise his current security "points."

192. Approximately 3 hours later Plaintiff was in SHU.

193. "Insolence" is a relatively minor shot that does not usually involve detention prior to DHO hearing.

194. The "shot" actually written was for "high severity disruptive conduct most like threatening."

195. The "shot" (anticipated Exhibit "7") claims amongst other things that "...Stilley aggressively approached me with fists clenched..."

196. These allegations are false.

197. The first version of this "shot" was signed by SHU Lt. T. Steffey in red ink, but not signed by Mr. Ardoin.

198. The second version of the "shot" is signed by Lt. Steffey in blue ink, and has what purports to be the signature of T. Ardoin.

199. The second version was served on Plaintiff 4 days later, on 9-14-15.

200. The BOP requires the service of a "shot," ~~within~~ completed as to Part I, within 24 hours of staff knowledge of the incident.

201. On information and belief, the "use it or lose it" rule was designed to deter blackmail by holding old accusations over the heads of inmates, and other misuse of the disciplinary process.

202. The BOP maintains a "PR II - Complete Administrative Record" for each inmate.

203. The PR II shows all disciplinary and administrative remedy activity for a particular inmate.

204. Plaintiff needs his PR II for at least 2 reasons.

205. First, Plaintiff needs it to prepare an accurate and well documented complaint pursuant to 28 USC 2241, relating to prison conditions.

206. Second, Plaintiff needs it to establish his right to dismissal of the "shot" on timeliness grounds, or other valid reason shown by the record.

207. Plaintiff has made repeated polite request, both oral and written, for his PR II.

208. Plaintiff has not received a written response, but has been informed by Lt. Steffey that the request is denied.

209. Plaintiff cannot adequately defend the "shot" or prosecute the appeal without these records including archival data.

210. Plaintiff declined food upon his placement in SHU 9-10-15. In due course Medical construed same as a hunger strike, without regard to ~~failure to declare~~ Plaintiff's failure to declare hunger strike.

211. Plaintiff has been on hunger strike status since that time.

212. Lt. Steffey placed Plaintiff under more restrictive conditions of confinement, assigning the hunger strike as a reason.

213. Plaintiff asked for copies of the BPA0321, BPA0292, and BPA0295 forms in his file.

214. Lt. Steffey has orally denied the request.

215. On information and belief, virtually none of the inmate files at Oakdale SHU are documented as required by Program Statement (PS) 541.22 and 541.26.

216. On information and belief, the same is true of the Forrest City SHU.

217. On information and belief, both Oakdale and Forrest City routinely leave inmates locked in SHU without the reviews required by the Program Statements.

218. On information and belief, both facilities routinely deny SHU inmates reasonable access to documents indispensable to a constitutionally adequate defense.

219. On information and belief, both facilities routinely flout the requirements of the FOIA and the companion provisions of the Program Statements, 513.40 @ through 513.68.
  513.40

220. On information and belief, both institutions force inmates to defend with their hands cuffed behind their back, without reasonable means to access and present papers, etc, as a matter of course.

221. On 9-16-15, Plaintiff submitted a 6 page hand written response to his "shot," and asked for a copy for his own use.

222. Despite repeated polite request, Plaintiff has no such copy, nor reason to believe that a copy will be provided in a reasonably timely manner.

223. On 9-23-15, Oakdale staff told Plaintiff that discussions had already taken place, concerning the possibility of shipping Plaintiff to yet another institution.

224. On 9-10-15, the day Plaintiff came to SHU, plaintiff asked for copies and a statement concerning timeliness, with respect to the appeal of the Forrest City "shot."

225. Despite due diligence, Plaintiff still lacks the material indispensable to the filing of that appeal, and related administrative remedies.

226. Another transfer would be devastating to Plaintiff's efforts to preserve his legal rights.

227. There is no substantial basis for another transfer at this time, except a desire to interfere with Plaintiff's right of reasonable access to the courts

# COUNT 1 - FREEDOM OF INFORMATION ACT CLAIMS

228. Since commencing the drafting of this complaint Plaintiff has secured a limited timespan for legal research.

229. As a result Plaintiff has concluded that the only necessary parties Defendant are the United States and the DOJ-FBOP.

230. Subject to the right to amend if objection is made, Plaintiff has stricken all other parties from the caption of the complaint.

231. Plaintiff has requested a set of his medical records since 2011.

232. Plaintiff has repeatedly been told to wait longer.

233. The DOJ-FBOP keeps the bulk of its medical records on a system called Bureau Electronic Medical Records (BEMR).

234. On information and belief, BEMR documentary records are generally in pdf and thus disclosable via electronic File sharing.

235. Plaintiff's medical record also includes diagnostics such as X-rays, video of force feedings, etc, which must necessarily be provided as electronic files,

236. Plaintiff on or about 4-15-15 requested his medical records, yet again, as part of a FTCA tort claim.

237. Plaintiff has been wrongfully denied his medical records despite proper request and due diligence.

238. Plaintiff intends to amend to provide a better documentary record, after he is again allowed access to his FTCA tort claim file, which is now in SHU property storage,

239. Other inmates have received their medical records through similar request.

240. Plaintiff is legally entitled to the records, in his choice of format,

241. Plaintiff chooses electronic format so he can store and use this information at his convenience. 5 USC 552 (a)(3)(B) & (C)

242. Plaintiff also asked Trust Fund Supervisor Chester Torry for a full set of his Trulincs files, with archival information, on 8-14-15.

243. Mr Torry had a duty to preserve these records, see 28 CFR 16.10.

244. Mr. Torry has not responded.

245. Plaintiff is entitled to sue to recover these records. 5 USC 552 (a)(6)(C)

246. The Trulincs files are indispensable to Plaintiff's BOP administrative remedies and appeals.

247. The Trulincs files also contain material needed for the litigation of other inmates.

248. For example, Plaintiff had a nearly completed proposed witness list for Charles Pierce and his appointed counsel R. Alan Cline.

249. Said list had information about the knowledge and temperament of witnesses, how to locate them, etc.

250. Program Statement 543.10 (10.)(F.)(1) provides the framework whereby Plaintiff might properly share legal files and information with inmates at another institution.

251. Lt. O. Mosley has not responded to Plaintiff's request of 8-16-15 for forms BPA0321, BPA0292, BPA0295, staff memos, and investigatory memos, from 2-18-14 - 3-20-14, and 7-21-15 through 8-25-15.

252. Plaintiff is now entitled to sue for and recover said records.

253. Plaintiff is also entitled to all such records pertaining to his current stay in SHU, plus a copy of his PRIL, Complete Administrative Record.

254. The facts and circumstances herein raise substantial questions whether agency personnel acted arbitrarily or capriciously with respect to the withholdings complained of.

255. The interests of justice and judicial economy militate in favor of the findings contemplated by 5 USC 552 (a)(4)(F).

256, A "Special Counsel" contemplated by said section would be better well adapted to assisting the BOP in making public or disclosable information actually and practically available to inmates making a request, without undue administrative burden or interference with BOP operations,

## COUNT 2 - FTCA CLAIM FOR DENIAL OF PRESCRIPTION EYEWEAR

257. Plaintiff wore vision correcting eyeglasses with "autotint" before coming to prison.

258. Plaintiff's doctor advised him that he had "a start of cataracts" and that it was important for him wear prescription autotint glasses, to protect against further damage and injury.

259. The BOP refuses to allow Plaintiff to receive his prescription glasses from home.

260. The BOP provides eyeglasses for inmates.

261. The BOP is about a year behind schedule.

262. BOP eyeglasses are routinely miscut.

263. In case of miscut eyeglasses, another long wait ensues.

264. The BOP does not provide any eyeglasses with autotint.

265. The BOP does not sell any eyewear, prescription or not, that claims to provide medically adequate protection from the harmful rays of the sun.

266. Plaintiff has been denied prescription eyeglasses since coming to prison.

267. Plaintiff made a number of efforts to get his eyeglasses, all without success.

268. Plaintiff made a timely FTCA claim, to the BOP.

269. Said claim has been denied. This claim is ripe for suit.

270. The denial of access to prescription eyeglasses amounts to negligence under Arkansas law, at the very least.

271. As a result plaintiff has difficulty seeing, has to squint to make things out, suffers eyestrain, etc,

272. Plaintiff loses much of the enjoyment of such activities as watching television.

273. Plaintiff has suffered an unknown amount of damage to his eyes due to lack of auto tint.

274. Plaintiff is entitled to reasonable compensatory damages for the negligence and damages complained of herein.

275. Plaintiff plans to plead all other FTCA claims within a reasonable time of getting access to his legal papers now in SHU property storage.

COUNT 3 - DECLARATORY JUDGMENT THAT PROHIBITION ON RECEIPT OF PRESCRIPTION EYEWEAR IS INVALID

276. The BOP prohibits inmates from receiving prescription eyewear from family, friends, or outside commercial providers of such goods.

277. Possession and use of such eyewear is allowed.

278. Self-surrender and transfer inmates are allowed to bring such eyewear with them.

279. There is no rational basis for allowing inmates to wear such eyewear, but not to replace it in case of loss, damage, change of prescription specifications, etc.

280. On information and belief, such policy has never actually been promulgated in compliance with federal law.

281. This policy damages taxpayers.

282. This policy injures indigent inmates, who must wait longer for eyeglasses than would otherwise be the case.

283. This policy is legally invalid, and should be so declared.

COUNT 4 - DECLARATORY JUDGMENT THAT THE BOP MAY NOT UNLAWFULLY SEIZE OR CONVERT THE WORK PRODUCT OF AN INMATE, YET CHARGE MONEY FOR IT

284. Plaintiff prepared a large number of Trulincs files, at a large expense.

285. Plaintiff was deprived of access to same by order of a DHO.

286. Plaintiff made a valid and lawful request for the files, in digital format.

287. The request was ignored.

288. The Program Statements and other authorities require preservation of such Files, upon receipt of an FOIA request.

289. Modern technology could enable Plaintiff to possess and effectively use the files, without Trulincs.

290. The BOP is not legally authorized to seize, convert, or appropriate work product files, regardless of the topic or character, and yet collect money for the privilege of producing such files.

291. Plaintiff is entitled to declaratory judgment so stating.

COUNT 5 — DECLARATORY JUDGMENT — BOP HAS A DUTY OF GOOD FAITH AND FAIR DEALING IN RECEIPT OF PROPERTY, ETC, PURSUANT TO 18 USC 4044

292. Pursuant to 18 USC 4044 "The Attorney General may... accept... any... gift or donation of money or property for use by the Bureau of Prisons... The Attorney General may... sell, assign, transfer, or convey such property other than money."

293. On information and belief, Forrest City Low has had about 60-90 computers on pallets, awaiting installation, for some 3 years.

294. These were bought with taxpayer money.

295. The refusal and neglect to install these computers for inmate use is motivated primarily by paranoia that inmates might use them for legal work.

296. The BOP routinely accepts donations.

297. For example, Mr Ardoin secured a "donation" of Plaintiff's 3 ring binder, on 9-10-15.

298. Forrest City stocked Neo Smarts in the prison library.

299. Incoming inmates possessing a Neo Smart had to send it home or donate it.

300. A "Neo Smart" is a typing device. It is thin and light, but is ancient technology on the street.

301. In prison a Neo Smart has value, because so few computers are available.

302. Forrest City has 16-18 educational computers. They aren't hooked to printers, and the computer room is locked most of the time.

303. Oakdale recently advertised a typing class, saying that only 16 seats were available.

304. That is only 1 seat per 100 inmates, a tiny fraction of the need.

305. Plaintiff on 9-8-15 submitted to Ms Wilson, Education Supervisor, a proposal for Plaintiff to provide Neosmarts and all necessary equipment and supplies at inmate expense, for a typing class of 20 inmates.

306. Plaintiff has received neither response nor acknowledgement.

307. Plaintiff is poor, but is confident of the ability to find 20 inmates to pay their own way for this class.

308. The BOP takes a "dog in the manger" approach. It neglects to timely provide for the health, education, and general welfare of inmates, yet obstructs the efforts of inmates, family, friends, and concerned citizens who try to fulfil unmet needs.

309. Plaintiff is entitled to declaratory judgment that the BOP has a duty of good faith and fair dealing in the receipt and disbursement of property pursuant to 18 USC 4044.

# PRAYER FOR RELIEF

Wherefore Plaintiff respectfully prays the following relief:

Count 1- FOIA

A) For Plaintiff's complete medical records including diagnostics and video of force feedings, in digital format;

B) For a complete set of Plaintiff's Trulincs drafts and documents in digital format, with allowance of the wherewithal to manipulate, use, print, and transfer same;

C) For all archival data related to said files, reasonably available;

D) For all forms BPA0321, BPA0292, BPA0295, staff memos, investigatory memos, from 2-18-14 to present, related to any of Plaintiff's confinements in SHU;

E) For Plaintiff's PRll Complete Administrative Record with all archival data appurtaining thereto;

F) For a written finding that the circumstances surrounding the with holding raise questions whether agency personnel acted arbitrarily or capriciously with respect to the withholding;

Count 2- FTCA

For denial of prescription eyewear AND all other FTCA claims, $950,000 or such other sum deemed fair and just;

Count 3- Declaratory Judgment- Prohibition on Prescription Eyewear

For declaratory judgment that the rule prohibiting receipt of prescription eyeglasses is legally invalid;

Count 4 - ~~Debts~~ Declaratory Judgment — Seizure or Conversion of Work Product

For declaratory judgment that the BOP has no right to maintain the charges for any work product, where the BOP has unlawfully deprived Plaintiff of the legal right to possess, access, or use such work product;

Count 5 — Duty of Good Faith and Fair Dealing in the administration of 18 USC 4044

For declaratory judgment that the BOP has a duty of good faith and fair dealing in the receipt and disbursement of donations of property, especially when the BOP neglects to timely and adequately provide for the health, education, and general welfare of inmates.

GENERAL

For costs and attorney fees to the extent of justice and legal entitlement; and for such other and further relief as may be appropriate whether or not specifically prayed.

VERIFICATION

Plaintiff pursuant to 28 USC 1746 declares under penalty of perjury that the foregoing is true, subject to reservations of "on information and belief."

P. 36

_____          _____
By: Oscar Stilley 10579-062              Date  10-1-15
FCI Oakdale-1
PO 5000
Oakdale LA 71463-5000


CERTIFICATE OF MAILING

Plaintiff pursuant to 28 USC 1746 declares under penalty
of perjury that he placed this pleading in the prison
outgoing mail system, 1st class postage prepaid, to;

James McCormack, Clerk
600 W Capitol Ave
Little Rock AR 72201-3325

on the date set forth above.

_____
Oscar Stilley

P. 37